**STATE OF LOUISIANA**

**COURT OF APPEAL**

**FIRST CIRCUIT**


**2022 CA 0793**


JOHN GLENN RAYMOND

VERSUS

FELIX LASSERRE, SR.


Judgment Rendered: **MAR 0 6 2023** _____

\* \* \* \* \* \*

On Appeal from the Twenty-Second Judicial District Court
In and for the Parish of St. Tammany
State of Louisiana
Docket No. 2021-14303
Honorable Richard A. Swartz, Judge Presiding

\* \* \* \* \* \*

| | |
|---|---|
| John Glenn Raymond<br>In Proper Person<br>Lacombe, Louisiana | Plaintiff/Appellee<br>John Glenn Raymond |
| John B. Wells<br>Slidell, Louisiana | Counsel for Defendant/Appellant<br>Felix Lasserre, Sr. |

\* \* \* \* \* \*

**BEFORE: McCLENDON, HOLDRIDGE, AND GREENE, JJ.**

Holdridge J. concurs w/ reasons

**McCLENDON, J.**

The instant appeal was filed by defendant-appellant, Felix Lasserre, Sr., from the trial court's judgment granting an order of protection in favor of plaintiff-appellee, John Glenn Raymond. Plaintiff-appellee filed an answer to the appeal. For the reasons that follow, we affirm the judgment on appeal and dismiss the answer to the appeal.

## FACTUAL AND PROCEDURAL HISTORY

On October 8, 2021, plaintiff filed a verified "Petition for Protection from Stalking or Sexual Assault" pursuant to LSA-R.S. 46:2171, *et seq.*, the "Protection from Stalking Act." Therein, plaintiff sought a protective order on his own behalf against defendant. According to plaintiff's petition for protection, beginning in August of 2021 and continuing through the date of filing, defendant harassed plaintiff; made or sent telephone calls, texts, emails, or other electronic communications to plaintiff; sent messages via a third party, letters, pictures, or public posts to social media; implied or threatened plaintiff with bodily injury; and stalked, harmed, or threatened to harm plaintiff, a member of plaintiff's family, or plaintiff's acquaintance. Plaintiff further alleged that the most recent incidents of abuse included "cyberstalking and text threats to [plaintiff] personally and also to [plaintiff's] church [and school, including] an indirect threat to [plaintiff's] church members, employees, teachers, and students." Plaintiff described past incidents of abuse as "[m]ultiple texts and social media posts."

Although plaintiff's petition for protection did not explain the history between the parties, the record reflects that plaintiff is a minister, or "Reverend," of New Horizon Church (the church), as well as the Headmaster of Lakeside Christian Academy (the school). For a period of time preceding the parties' quarrel, defendant and his family were members of the church, and defendant's wife (Mrs. Lasserre) was employed in an administrative capacity at the school. As part of Mrs. Lasserre's compensation, the Lasserre's five children attended the school without paying tuition. At some point, defendant and his family stopped attending the church, and Mrs. Lasserre's employment contract with the school was not renewed. Mrs. Lasserre learned that her employment contract had not been renewed on July 26, 2021. The interactions between the parties

2

forming the basis of plaintiff's petition for protection began either shortly before or shortly after Mrs. Lasserre learned of said contract non-renewal.

Based on plaintiff's petition for protection, a hearing officer of the Twenty-Second Judicial District Court issued a temporary restraining order (TRO) pursuant to LSA-R.S. 46:2171, *et seq.* The matter was originally set and came for hearing on October 22, 2021. However, defendant requested and was granted a continuance. The matter was reset for November 5, 2021. Additionally, an interim stipulation was entered enjoining defendant from posting to social media or in any electronic format "anything concerning [plaintiff]; the family of [plaintiff]; [plaintiff's church,] New Horizon Church; [plaintiff's employer,] Lakeside Christian Academy; and/or any ministry owned or associated with [plaintiff]," during the period between the October 22, 2021 hearing and the November 5, 2021 hearing date.

During the November 5, 2021 hearing, testimony was heard, evidence was offered, filed, and introduced, and the matter was submitted. The hearing officer issued oral findings of fact and an oral recommendation that plaintiff's petition for protective order be granted for a period of eighteen months and that defendant be cast with costs. The hearing officer executed a written recommendation consistent with his oral finding and oral recommendation the same day.

Defendant timely filed an exception to the hearing officer's recommendation on November 12, 2021. The trial court held a hearing on defendant's exception to the hearing officer's recommendations on February 16, 2022. The trial court met with counsel in chambers and advised that the trial would be *de novo.* Counsel agreed. Testimony was heard and submitted by both parties.

On February 18, 2022, the trial court issued written reasons for judgment.[1] That same day, the trial court issued a completed "Uniform Abuse Prevention Order" form

---

[1] The trial court's written reasons began by considering, and overruling, an evidentiary objection defendant raised at the February 16, 2022 hearing. As defendant does not assign this evidentiary ruling as error, it is not before us on appeal.

Regarding the protective order, the trial court wrote:

The evidence established that [plaintiff] is a minister at New Horizon Church. [Defendant's] wife was employed as secretary to [plaintiff]. [Defendant] sent texts and made posts to social media which prompted [plaintiff] to seek a protective order on the grounds that [defendant's] actions amount to cyberstalking. On November 5, 2021[,] [the hearing officer] found that [defendant] cyberstalked [plaintiff] and recommended a

3

(protective order form), as required by LSA-R.S. 46:2136.2(C) in connection with the issuance of any TRO or protective order.[2] The completed protective order form indicated that a protective order was issued pursuant to LSA-R.S. 46:2171, *et seq.*, pertaining to non-intimate stalking by an acquaintance. The term of the protective order was eighteen months from the date of issuance, or until August 18, 2023. During this time period, the protective order form prohibited defendant from: abusing, harassing, assaulting, stalking, following, tracking, monitoring, or threatening plaintiff in any manner; contacting plaintiff personally, through a third party, or via public posting, by any means, including written, telephone, or electronic (text, email, messaging, or social media) communication without the express written permission of the trial court; going within 100 yards of plaintiff or his residence; going within 100 yards of plaintiff's place of employment/school and interfering with plaintiff's employment/school; and damaging any property or belongings of plaintiff or in any way interfering with his living conditions. The completed protective order form also ordered defendant to pay "attorney fees," though the form did not indicate to whom or in what amount the attorney fees were to be paid.

---

[p]rotective [o]rder issue for a period of 18 months ordering [defendant] not to abuse, harass, assault, stalk, follow, track, monitor[,] or threaten [plaintiff] in any manner whatsoever. [Defendant] filed the instant [e]xception seeking a trial [*de novo*] denying [p]laintiff's Petition for Protective Order on the following grounds:

[Defendant] urges that [p]laintiff lacks sufficient facts to support the granting of a protective order, and lacks evidence to support his claim that he suffered any damages.

. . .

The Court finds that while some of [defendant's] acts may have been protected speech, there were other texts and social media posts that were for the purpose of threatening[] or harassing [plaintiff] and those communications in combination amount to cyberstalking. Accordingly, [p]laintiff is entitled to a [p]rotective [o]rder for a period of 18 months ordering [d]efendant not to abuse, harass, assault, stalk, follow, track, monitor[,] or threaten [plaintiff] in any manner whatsoever. He is ordered not to contact [plaintiff], personally, through a third party[,] or via public posting by any means, including written, telephone, or electronic communication without the express[] permission of the court. He is ordered not to go within 100 yards of [plaintiff], his residence, his place of employment at either the church, 3401 Pontchartrain Drive, Slidell, Louisiana 70458, or the school, Canulette Drive Slidell, Louisiana 70458. Defendant is cast with all costs of these proceedings.

[2] Louisiana law mandates that trial courts use a uniform form for the issuance of any TRO or protective order, called the "Uniform Abuse Prevention Order." See LSA-R.S. 46:2136.2(C); **Head v. Robichaux,** 2018-0366 (La.App. 1 Cir. 11/2/18), 265 So.3d 813, 816. The trial court checks off a box provided on the uniform form to indicate under which law it issues the TRO and/or protective order: (1) LSA-R.S. 46:2131, *et seq.* (Domestic Abuse); (2) LSA-R.S. 46:2151 (Dating Violence); (3) LSA-R.S. 46:2171, *et seq.* (Non-intimate stalking); (4) LSA-R.S. 2181, *et seq.* (Non-intimate sexual assault); (5) LSA-Ch.C. art. 1564, *et seq.* (Children's Code Domestic Abuse); or, (6) a court approved consent agreement. **Head,** 265 So.3d at 816-17.

4

Similarly, the completed protective order form ordered defendant to pay "all court costs" to the "clerk of court," without specifying the amount to be paid.

Defendant now appeals, asserting that the trial court erred in granting the protective order. Plaintiff answered the appeal, requesting that this Court award "the reasonable sum of $1,500.00 for trial attorney fees, together with an additional sum of $750 for responding to this appeal, together with all costs of both courts."[3]

## PROTECTION FROM STALKING ACT

Louisiana Revised Statutes 46:2171, *et seq.*, known as the "Protection from Stalking Act," was enacted to provide a civil remedy for stalking victims against perpetrators, offering immediate and easily accessible protection.[4] LSA-R.S. 46:2171. Under the Protection from Stalking Act (the Act), "stalking" means any act that would constitute the crime of stalking under LSA-R.S. 14:40.2 or cyberstalking under LSA-R.S. 14:40.3. See LSA-R.S. 46:2172; **Scott v. Hogan**, 2017-1716 (La.App. 1 Cir. 7/18/18), 255 So.3d 24, 29. However, despite the Act's reference to these criminal stalking statutes, petitions for protection from stalking are not criminal proceedings. Rather, "the sole relevance" of the criminal stalking statutes in the context of a petition filed under the Act is "to provide the definition of stalking." See **Smith v. Dugas**, 2019-0852 (La.App. 1 Cir. 2/26/20) 2020 WL 913673, *2 (unpublished).

---

[3] On October 20, 2022, plaintiff filed a "Request for Sur-Reply Brief." In response to plaintiff's request, defendant filed a "Motion to Strike Appellee 'Sur-Reply' or in the Alternative to Hold Appellee in Contempt of Court" the following day. On January 9, 2023, this Court denied plaintiff's request and denied defendant's motion as moot.

[4] The statement of purpose of the Act is set forth in LSA-R.S. 46:2171, which provides:

> The legislature hereby finds and declares that there is a present and growing need to develop innovative strategies and services which will reduce and treat the trauma of stranger and acquaintance stalking. The nature of stalking allegations are sometimes not easily substantiated to meet the prosecution's burden of proving the case beyond a reasonable doubt, and victims of stalking are left without protection. Orders of protection are a proven deterrent that can protect victims of stalking from further victimization; however, many victims are forced to pursue civil orders of protection through ordinary process, often unrepresented, rather than through a shortened, summary proceeding. Additionally, victims of stalking are not always aware of the vast resources available to assist them in recovering from the trauma associated with being a victim of stalking. It is the intent of the legislature to provide a civil remedy for victims of stalking that will afford the victim immediate and easily accessible protection.

5

Louisiana Revised Statutes 14:40.3(B) defines the offense of cyberstalking as follows:

> Cyberstalking is action of any person to accomplish any of the following:
>
> (1) Use in electronic mail or electronic communication of any words or language threatening to inflict bodily harm to any person or to such person's child, sibling, spouse, or dependent, or physical injury to the property of any person, or for the purpose of extorting money or other things of value from any person.
>
> (2) Electronically mail or electronically communicate to another repeatedly, whether or not conversation ensues, for the purpose of threatening, terrifying, or harassing any person.
>
> (3) Electronically mail or electronically communicate to another and to knowingly make any false statement concerning death, injury, illness, disfigurement, indecent conduct, or criminal conduct of the person electronically mailed or of any member of the person's family or household with the intent to threaten, terrify, or harass.
>
> (4) Knowingly permit an electronic communication device under the person's control to be used for the taking of an action in Paragraph (1), (2), or (3) of this Subsection.

Louisiana Revised Statutes 14:40.3(B) does not define the terms "threaten," "terrify," or "harass." Therefore, each must be given its generally prevailing meaning based on context and common usage. See LSA-C.C. art. 11; LSA-R.S. 1:3; **Guitreau v. Kucharchuk**, 99-2570 (La. 5/16/00), 763 So.2d 575, 579. "Threat" is defined by Black's Law Dictionary, 11th ed. 2019, as "[a] communicated intent to inflict harm or loss on another or on another's property . . . a declaration, express or implied, of an intent to inflict loss or pain on another" and "[a]n indication of an approaching menace; the suggestion of an impending detriment." Black's defines "[h]arassment" as "[w]ords, conduct, or action (usu. repeated or persistent) that, being directed at a specific person, annoys, alarms, or causes substantial emotional distress to that person and serves no legitimate purpose; purposeful vexation." "Terrify" means "to drive or impel by menacing," or "to fill with terror," and "terror" means "a state of intense or overwhelming fear." Merriam–Webster Online Dictionary (Merriam–Webster.com). As used in LSA-R.S. 14:40.3(B)(2), "threatening," "terrifying," and "harassing" are the adjective forms of "threat," "terrify," and "harass," and all three words modify "purpose."

## BURDEN OF PROOF

At a hearing on a protective order, the petitioner must prove the allegations by a preponderance of the evidence. **Head v. Robichaux**, 2018-0366 (La.App. 1 Cir. 11/2/18), 265 So.3d 813, 816. Proof is sufficient to constitute a preponderance of the evidence, for the purposes of a protective order, when the entirety of the evidence, both direct and circumstantial, shows that the fact sought to be proved is more probable than not. **Head**, 265 So.3d at 816.

## STANDARD OF REVIEW

A trial court's decision to issue or deny a protective order is reversible only upon a showing of an abuse of discretion. Additionally, the trial court sitting as a trier of fact is in the best position to evaluate the demeanor of the witnesses, and its credibility determinations will not be disturbed on appeal absent manifest error. **Scott v. Hogan**, 2017-1716 (La.App. 1 Cir. 7/18/18), 255 So.3d 24, 31.

## DISCUSSION

In this matter, we are tasked with determining whether the trial court properly issued the February 18, 2022 protective order in favor of plaintiff. Having thoroughly reviewed the entirety of the record before us, and having carefully considered the applicable law, we find the trial court did not abuse its discretion in issuing the protective order, nor did the trial court manifestly err in making its credibility determinations.

In this matter, the parties disagree on many details regarding the circumstances giving rise to the dispute between them. For example, defendant claims his wife was fired without warning, while plaintiff testified that Mrs. Lasserre ignored multiple requests to discuss her contract before she was informed it was not renewed. Similarly, defendant testified that he began making negative posts about plaintiff before his wife was fired, and plaintiff testified that defendant did not begin making negative posts about him until afterward. Other points of contention include whether the parties properly returned school and personal property following Mrs. Lasserre's termination.

Significantly, there is little, if any, dissent regarding the actions on which plaintiff's petition for protective order were based. Plaintiff alleged, and defendant admitted at trial, that on July 29, 2021, shortly after Mrs. Lasserre learned her employment contract

7

was not renewed, defendant sent the following text message to plaintiff and his daughter, Ms. Lynch:

> Well COWARD! So u hear it from a real man with a Spine[.] I will make it my life's work to see that you and your [cult] you disguised as a church goes to ZERO. I will run a cam-paign until this is done! You poke the wrong one Jhon Coward! To zero.

This message, which we will refer to as the "to zero" text, was followed by at least one text message on July 26, 2021; at least one text message on July 29, 2021; at least one text message on August 2, 2021; at least two text messages on August 3, 2021; at least three text messages on August 4, 2021; and at least one text message on October 5, 2021. Additionally, on August 5 and August 29, 2021, defendant sent plaintiff text cartoons of a man sitting in what appears to be a movie theater seat and eating popcorn. While it is unnecessary to recount the content of each text message in detail, we reference a few for illustrative purposes. For example, on August 3, 2021, defendant sent the following text message to plaintiff and Ms. Lynch: "So u can be prepared to cower behind your staff of Women. I will be coming to [the church] to remove my family's personal prop-erty. And pick u school transcript." And, on October 5, 2021, defendant sent the following text message to plaintiff: "I'm still out here coward shit no one anything you put out I hope you're enjoying the ride[.]"

In addition to the text messages defendant sent to plaintiff directly, defendant admitted that he generated and operated a Facebook page named "Jhon (sic) Doe." Numerous posts from the Jhon Doe Facebook account were identified by defendant and admitted into evidence, including one that read:

> So, apparently, [plaintiff] has an excuse to be a piece of shit coward to other Christians, because [Monica Lynch, plaintiff's daughter,] found a scripture to allow her to believe her father is not a monster, non-Christian faith-destroying man. But he actually is.

On August 4, 2021, defendant posted "#CancelJohnRaymond #JohnCoward" to the Jhon Doe Facebook book page. And, on October 22, 2021, hours after the hearing at which defendant stipulated to the temporary injunction, defendant posted:

> God is great!! Know if God is in your corner you can defeat all of Satan's army!! Don't allow a cult scare you into believing there's no other choices. Stand up for your belief in God the rest will follow. All glory to God.

8

The October 22, 2021 post was accompanied by a picture of plaintiff, depicted with red pupils, and with the phrase "save Brothers and Sisters of Christ From John Raymond" printed over plaintiff's image in red text. As with the text messages, these examples are only a few of many posts from the Jhon Doe Facebook account admitted into evidence at the February 16, 2022 hearing. Others purported to be "warning[s] to the community," repeating that plaintiff was "not a Christian man" and was a "coward." Some included apparent links to a "private group" titled "Christians of St. Tammany against John Raymond." Additional posts stated plaintiff treated people poorly, refused to return items of personal property, and could not be trusted with finances.[5]

When plaintiff testified regarding the effect defendant's texts and posts had on him, plaintiff expressed that defendant's actions made him afraid for his safety, as well as the safety of his family, church, and school. Plaintiff stated, "I feel my life is threatened. I feel our church is threatened. I'm very scared. My family is scared. Church members are scared who shared these posts with me." With respect to the language used in the "to zero" text message, plaintiff stated that he found the language to be evocative of "[G]round [Z]ero" associated with the 9/11 attack. Plaintiff also testified that defendant's language stirred fears of school shootings and church bombings, particularly in light of defendant's expressions of anger. Plaintiff testified:

> You know, knowing [defendant] like I have for a number of years, it scared the living daylights out of me. And he can claim that it's the cancel culture. But I looked up cancel in my dictionary, and it says to destroy, to eliminate. So I fear for my life.

> Our school was virtually on lockdown for a couple of weeks. Every day we're looking in the parking lot to see if [defendant] is going to show up and do a school shooting. I mean, this is serious business. I run a school of 200 kids. I take it very seriously. So we feel very threatened.

---

[5] An apparently unrelated post from the Jhon Doe Facebook account read, "People ask how you deal with 5 kids. Do I need to say anymore[?]" A photograph of five children in a dog crate accompanied the post.

9

Plaintiff also testified to the disturbance he felt as a result of being referred to as the Antichrist:

> [The hearing officer] was looking me in the eye when he said Antichrist twice. And he said do you believe John Raymond is the Antichrist? [Defendant] said, yes, I believe John Raymond is the Antichrist, to which [the hearing officer] said that is very disturbing because even a good Christian who doesn't wish other people harm might find it an honor to kill the Antichrist.

Three other witnesses testified on behalf of plaintiff. Buffie Crawford Singletary, the school principal, stated that if she saw defendant on the school grounds, she would "lock it down and call the cops, because he does intimidate [her] that much, and he has been so volatile in his personality." She also described speaking to Mrs. Lasserre on the phone after she was informed her employment contract was not renewed. According to Ms. Singletary, defendant took the phone from Mrs. Lasserre and asked Ms. Singletary, "Are you that F-ing stupid that you believe everything [plaintiff] says[?]"

Tabitha Coogan, the parent of a student at the school, testified that the Jhon Doe Facebook account posts angered and frightened her. Ms. Coogan explained that the school website had used a photograph showing plaintiff escorting Ms. Coogan's daughter into the school building, with Ms. Coogan's authorization. However, without obtaining Ms. Coogan's authorization, defendant posted the same photograph to the Jhon Doe Facebook account, with a gray circle superimposed over the child's face and a magnified image of the child's hand. The caption read in part, "Omg why is this child so scared! I'm not sure if this is the universal distress sign. Looks close." Ms. Coogan was disturbed by defendant's use of her daughter's photograph for several reasons, stating that she did not authorize him to use the photograph and she did not agree with defendant's claim that her daughter appeared to be in distress in the photo. Ms. Coogan explained, "You're using my child's picture to do harm to someone else." Ms. Coogan also expressed concern for her child's safety because the photograph could reveal her location. Ms. Coogan's daughter was seven years old at the time of trial.

Monica Lynch, plaintiff's daughter, also testified on plaintiff's behalf. Ms. Lynch recounted defendant forwarding her the "to zero" text message he sent her father, stating, "And that was scary. And knowing [defendant], I believed him." Defendant also

10

targeted Ms. Lynch from the Jhon Doe Facebook account, posting her picture with the following language:

> Christian community beware of this snake! The apple doesn't fall far from the Jhon Raymond tree here. After I notified their family that we were leaving this church. She reached out to my child and not in a spiritual way but in a way to make her lean against me!! I raise my children to be smarter than the fall for people like this. I pray your children are safe and wise enough to not be friended by this woman. !!

Ms. Lynch expressed grief over the manner in which her relationship with defendant's family, particularly his children, ended. She described anxiety over when the next communication from defendant would be received and what the content might be, and stated that she had "gotten a weapon" for "personal safety."

In this matter, defendant readily admitted to sending the complained-of text messages to plaintiff and Ms. Lynch, as well as being responsible for the Jhon Doe Facebook posts. Further, defendant's "to zero" text message expressed his intent to "make it [defendant's] life's work to see that [defendant] and [defendant's cult] disguised as a church goes to ZERO." Having thoroughly considered the record in its entirety, we find that the record supports a finding that plaintiff proved, by a preponderance of the evidence, that defendant's actions constituted cyberstalking pursuant to LSA-R.S. 14:40.3(B)(2).

Further, we find no merit in defendant's varied arguments asserting that the trial court erred in granting the protective order. Although defendant denied that he ever posed or intended a physical threat, LSA-R.S. 14:40.3(B)(2) does not require a physical threat. Regarding defendant's argument that the definition of stalking set forth in LSA-R.S. 14:40.3 required "direct communication from stalker to stalkee" and the majority of the complained-of statements were made via the Jhon Doe Facebook account to a third-party audience, rather than directly to plaintiff, defendant is simply incorrect. The cyberstalking statute does not require the electronic communication be transferred or transmitted directly to the victim. **Terrell v. Derouen**, 2021-1327 (La.App. 1 Cir. 7/5/22), 345 So.3d 1065, 1071; See **Head**, 265 So.3d at 819. Thus, it is irrelevant that plaintiff was "blocked" from the Jhon Doe Facebook account and was shown the posts by other people who had access to the account.

11

With respect to defendant's characterization of his conduct as an attempt to voice his opinion and exercise his freedom of speech under the First Amendment, defendant's argument also fails. Although the First Amendment to the United States Constitution and Louisiana Constitution Article I, § 7 prohibit the enactment of laws abridging the freedom of speech, the right of free speech is not unlimited. **Terrell**, 345 So.3d at 1070-71. The First Amendment does not protect a true threat, which is "a statement that a reasonable recipient would have interpreted as a serious expression of an intent to harm or cause injury to another." **State v. Buckenberger**, 2019-0833, 2019 WL 4235982 (La.App. 1 Cir. 9/3/19) (unpublished), writ denied, 2020-00317 (La. 7/24/20), 299 So.3d 76, citing **United States v. Beale**, 620 F.3d 856, 865 (8th Cir. 2010), cert. denied, 562 U.S. 1190, 131 S. Ct. 1023, 178 L.Ed.2d 847 (2011). Nor does the First Amendment protect criminal activity, even when carried out with words. **State ex rel. RT**, 2000-0205 (La. 2/21/01), 781 So.2d 1239, 1243. We have already determined that the trial court did not abuse its discretion in determining that defendant's actions constituted threats and harassment amounting to the criminal offense and cyberstalking as defined by LSA-R.S. 14:40.3. We likewise find that defendant's threatening and harassing actions were not the class of actions protected by the First Amendment right of free speech.

Defendant also claims that his "public social media posts" were not intended to harass plaintiff. Rather, defendant's purpose was to "inform the local community of an issue of public concern," specifically "the threat that [defendant] legitimately believed [plaintiff] posed to the churchgoers and to children." He insists that he sent text messages to plaintiff to "express[] his frustrations to [plaintiff] over the undignified way his wife had been fired . . . and to schedule a time to pick up his wife's personal property from the school." Defendant contends that his actions are, therefore, exempted from classification as cyberstalking pursuant to Paragraph E of LSA-R.S. 14:40.3, which provides that "any peaceable, nonviolent, or nonthreatening activity intended to express political views or to provide lawful information to others" is not cyberstalking. However, these arguments contradict defendant's explicit expression of intent to threaten, terrify, and harass plaintiff in the "to zero" text message. Where, as in this case, two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly

12

erroneous or clearly wrong. See **Stobart v. State, through Department of Transportation and Development**, 617 So.2d 880, 882 (La. 1993). Thus, we cannot fault the trial court's decision to discount defendant's self-serving characterization of his actions as an attempt to exercise his freedom of speech "to warn" his community and express his "frustrations."

For the reasons expressed herein, we find no manifest error in the trial court's factual findings, and we discern no abuse of discretion in the trial court's legal ruling that affirmed the actions of the hearing officer. See **Shirley v. Shirley**, 47,442 (La.App. 2 Cir. 10/10/12), 107 So.3d 99, 102. Accordingly, the trial court's judgment granting the protective order is affirmed.

## THE ANSWER TO THE APPEAL

As noted above, plaintiff answered the appeal, asking that this Court award "the reasonable sum of $1,500.00 for trial attorney fees, together with an additional sum of $750 for responding to this appeal, together with all costs of both courts." In response, defendant argues that plaintiff should have made this request to the trial court and the answer to the appeal should be dismissed.

Pursuant to the 2021 amendments to LSA-C.C.P. art. 2088, the trial court retains jurisdiction while an appeal is pending to set and tax costs, expert witness fees, and attorney fees. See LSA-C.C.P. art. 2088(A)(10) and Comments 2021, comment (a); **Locke v. MADCON Corporation**, 2022-0630 (La.App. 1 Cir. 12/22/22), ___ So.3d ___, ___, 2022 WL 17845489, *2; **Lathan Co. v. Department of Education**, 2022-0215 (La.App. 1 Cir. 6/21/22), 2022 WL 2230376 (unpublished writ action). Thus, this Court does not have jurisdiction to grant plaintiff's request to set attorney fees incurred at the trial court, and this request is more properly directed to the trial court. We further note that when a party who was awarded attorney fees in the trial court is forced to and successfully defends against an appeal, an increase in attorney fees should generally be granted. **Nitcher v. Northshore Regional Medical Center**, 2011-1761 (La.App. 1 Cir. 5/2/12), 92 So.3d 1001, 1014, writ denied, 2012-1230 (La. 9/21/12), 98 So.3d 342. However, given that the trial court has not awarded attorney fees, we decline to address

13

the issue of appellate court attorney fees. Accordingly, we dismiss the answer to the appeal as premature.[6]

## CONCLUSION

For the foregoing reasons, the February 18, 2022 order of protection is affirmed. The answer to appeal is dismissed. Costs of the appeal are assessed to Felix Lasserre, Sr.

**JUDGMENT AFFIRMED; ANSWER TO APPEAL DISMISSED.**

---

[6] This case illustrates one of the complications resulting from the present version of LSA-C.C.P. art. 2088(A)(10), which requires the appellate court to treat a judgment as final even though it awards attorney fees but fails to set the amount of attorney fees. However, correcting this issue falls within the domain of the legislative branch of government.

JOHN GLENN RAYMOND

VERSUS

FELIX LASSERRE, SR.

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2022 CA 0793

 HOLDRIDGE, J., concurs.

I respectfully concur with the opinion. I would hold that some of the posts made by Mr. Lasserre on his Facebook page are protected speech under the First Amendment.